# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HEATHER BUCK and JOSE GUADELUPE ARIAS-MARAVILLA, | CIVIL ACTION NO. 3:07-CV-0717 |
| Plaintiffs, | |
| v. | (JUDGE CAPUTO) |
| DOROTHY STANKOVIC, Register of Wills for Luzerne County (in her individual and official capacities), | |
| Defendant. | |

## **MEMORANDUM**

Presently before the Court is Plaintiffs Heather Buck and Jose Guadelupe Arias-Maravilla's Motion for Temporary Restraining Order and/or Preliminary Injunction prohibiting Defendant Dorothy Stankovic, Register of Wills for Luzerne County, her agents and employees, from requiring Plaintiff Arias to prove his lawful presence in the United States as a condition of obtaining a marriage license. (Doc. 3.) A hearing was held on Thursday, April 26, 2007, supplemental briefs were filed and Plaintiffs' motion is ripe for disposition. For the reasons set forth below, Plaintiffs' motion will be granted. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as 42 U.S.C. § 1983.

The question before me is whether Defendant can, by prescribing a process for identifying an applicant for a marriage license, deny an undocumented alien and his citizen fiancé a marriage license. Defendant is charged with the duty of issuing marriage licenses for the Commonwealth of Pennsylvania in the County of Luzerne. Defendant fashioned a policy of requiring: (1) photo identification; (2) a birth certificate, which, if in a

foreign language, must be accompanied by a certified translation; (3) a divorce decree if one of the applicants was previously married; and (4) fifty dollars ($50.00).  With respect to the photo identification, if the applicant is not a United States citizen, Defendant requires that the applicant, if a permanent resident, present his United States Permanent Resident Card, also known as a "Green Card", *see* Wikipedia, The Free Encyclopedia, "Greencard", http://en.wikipedia.org/wiki/Greencard (last visited May 1, 2007), or, in the case of a foreign national like Mr. Arias, the applicant must present his foreign passport with a visa.  "A visa is a document issued by a country giving an individual permission to formally request entrance to the country during a given period of time and for certain purposes and most always stamped or glued inside of a passport." Wikipedia, *supra*, "Visa (document)", http://en.wikipedia.org/wiki/Visa_%28document%29.  It is the requirement that a non-citizen show proof of his lawful presence in the United States that is called into question by this case because the requirement effectively denies a marriage license to any undocumented alien, since only non-citizens in the United States legally have a visa or Green Card.

Plaintiff Heather Buck is a United States citizen.  Plaintiff Jose Guadelupe Arias-Maravilla is a citizen of Mexico who entered the United States without authorization. Since October 2005, Ms. Buck and Mr. Arias have lived together in their home in West Hazleton, Pennsylvania.  On December 21, 2006, Plaintiffs had a son, Xavier Jose Arias.

On Tuesday, April 17, 2007, Plaintiffs went to Defendant's office in Wilkes-Barre, Pennsylvania to obtain a marriage license.  Plaintiffs spoke with Deputy Register of Wills, Donald Williamson.  Mr. Arias presented his birth certificate, accompanied by a certified English translation, his Mexican passport, and documents from his immigration

proceedings before Immigration Judge Walter A. Durling, among which was an order granting Mr. Arias' application for voluntary departure until May 12, 2007. Mr. Williamson noted that he was satisfied with Mr. Arias' photo on his Mexican passport. However, because the passport did not contain a visa evidencing Mr. Arias' lawful presence in the United States, Mr. Williamson denied Plaintiffs' request for a marriage license. In so doing, Mr. Williamson refused to look at the documents from Mr. Arias' immigration proceeding.

## LEGAL STANDARD

In order to grant a motion for a preliminary injunction, a district court must address the following four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denial of the relief; (3) whether granting relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *A.C.L.U. v. Ashcroft*, 322 F.3d 240, 250 (3d Cir. 2003).

## DISCUSSION

### I.     Abstention

As an initial matter, Defendant asserts that the Court should abstain from adjudicating Plaintiffs' case, arguing that an uncertain issue of state law exists as to the interpretation of 23 PA. CONS. STAT. ANN. § 1301(c), which provides that "[p]rior to issuance of the [marriage] license, the person issuing the license must be satisfied as to the identity of both of the applicants." Specifically, Defendant argues that the provision leaves unclear what documents are needed in order for a marriage license applicant to

3

satisfactorily establish his identity.  Defendant contends that this uncertain issue of state law is amenable to state court interpretation, noting that the Pennsylvania Marriage Law, 23 PA. CONS. STAT. ANN. § 1308, provides for judicial review by the Orphans Court in cases where a marriage license is refused.  Adjudication by the Orphans Court would potentially narrow the issues or even obviate the need for this Court to decide Plaintiffs' constitutional claims.  Defendant also avers that this Court's erroneous construction of section 1301(c) would disrupt important state policy related to the social relation of marriage.

    **A.**    **Legal Standard**

Federal courts generally lack the authority to abstain from exercising jurisdiction that has been conferred. *See New Orleans Pub. Serv. v. New Orleans*, 491 U.S. 350, 358 (1989).  "Underlying [this] assertion[ ] is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *Id.*  "Nonetheless, because federal courts have discretion in determining whether to grant certain types of relief, abstention is appropriate in a few carefully defined situations." *Gwynedd Props. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1199 (3d Cir. 1992).  Abstention, however, "is the exception, not the rule." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813 (1976).

Abstention is "an extraordinary and narrow exception . . . [and is appropriate] only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959).  Not only is abstention rarely proper, but

abstention "is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964). "Ambiguity in state law will not, standing alone, require abstention." *Id.*

Abstention under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), is appropriate only "when the plaintiff properly invokes the federal jurisdiction in the first instance and the federal court temporarily abstains from exercising its jurisdiction pending the state court decision on a state law question." *Ivy Club v. Edwards*, 943 F.2d 270, 280 (3d Cir. 1991). "[A]bstention under *Pullman* merely postpones the exercise of federal jurisdiction." *Allen v. McCurry*, 449 U.S. 90, 101 n. 17 (1980). The purpose of *Pullman* abstention is to avoid (1) unnecessary constitutional pronouncements that could ultimately be displaced by a state court adjudication of state law; and (2) undue influence with state programs and policies. *Planned Parenthood of Central New Jersey v. Farmer*, 220 F.3d 127, 149 (3d Cir. 2000) (citation omitted).

*Pullman* abstention is appropriate when "a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question." *Pullman*, 312 U.S. at 500 (1941). Three "special circumstances" must exist for a federal court to apply *Pullman* abstention: (1) uncertain issues of state law underlying the federal constitutional claims brought in federal court; (2) state law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims; and (3) a federal court's erroneous construction of state law would

5

be disruptive of important state policies. *Chez Sez III Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991).

Even if all three special circumstances are present, the Court retains the discretion whether or not to abstain. As such, discretionary factors, such as (1) the availability of an adequate state remedy, (2) the length of time the litigation has been pending, and (3) the impact of delay to the litigants, should be considered in order to determine whether abstention is consistent with equity. *Id.* at 631-33. The party urging abstention "bears a heavy burden of persuasion." *Synagro-WWT, Inc. v. Rush Twp.*, 204 F. Supp. 2d 827, 835 (M.D. Pa. 2002).

**B.   Analysis**

Defendant has not persuaded the Court that abstention is appropriate. While it is true that section 1301(c) has never been given judicial construction, a factor which would ordinarily favor abstention, the United States Supreme Court has made clear that not every case that potentially involves an uninterpreted state statute constitutes a proper case for abstention. *Procunier v. Martinez*, 416 U.S. 396, 401 (1974), *overruled in part on other grounds, Thornburgh v. Abbott*, 490 U.S. 401 (1989).

Defendant essentially argues that section 1301(c), which requires that "the person issuing the license must be satisfied as to the identity of both of the applicants," is so vague that the Court should allow the Orphans Court the opportunity to determine what is required of a marriage applicant in order to prove his identity. However, such a circumstance does not support the invocation of the abstention doctrine because, while this issue of state law may be uncertain, it cannot fairly be said to underlie or control this case. Rather, it is Defendant's policy of requiring that foreign nationals present a passport and current visa in order to obtain a marriage license, not section 1301(c), that

Plaintiffs challenge. Plaintiffs do not challenge Defendant's policy as violative of section 1301(c) or the Pennsylvania Constitution, but rather the United States Constitution. As such, the right alleged is "plainly federal in origin and nature." *McNeese v. Board of Education for Community Unit School District, 187, Cahokia, Ill.*, 373 U.S. 668, 674 (1963). The federal right is not in any way "entangled in a skein of state law that must be untangled before the federal case can proceed. For [Plaintiffs] assert that [Defendant] ha[s] been and [is] depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether [Defendant's] conduct is legal or illegal as a matter of state law." *Id.* Accordingly, Plaintiffs' claims are entitled to be adjudicated in the federal courts. Abstention is therefore inappropriate.

Moreover, even assuming all three special circumstances were present, the Court would nevertheless adjudicate Plaintiffs' claims. In order for Mr. Arias to report to a United States Embassy or Consulate in Mexico by May 12, 2007, he must begin his return to Mexico by May 7, 2007, less than one week from now. As such, the delay that would necessarily accompany the Court's decision to abstain from adjudicating Plaintiffs' claims would bring significant harm to Plaintiffs. Abstention, therefore, is not consistent with equity.

Accordingly, the Court will not abstain from adjudicating the merits of Plaintiffs' constitutional claims.

**II.     Reasonable Probability of Success on the Merits**

    **A.     Due Process & Equal Protection**

        **1.     Plaintiffs possess a fundamental right to marry**

Ms. Buck, as a United States citizen, possesses a fundamental right to marry. *Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) (reaffirming the fundamental character of

7

the right to marry); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause); *Escobar v. I.N.S.*, 896 F.2d 564, 569 (D.C. Cir. 1990) (holding that section 5 of the Immigration Marriage Fraud Amendments of 1986, 8 U.S.C. §§ 1154(h), 1255(e), which required that an alien who married a United States citizen during the pendency of deportation proceedings reside outside the United States for two years before a petition predicated on immediate relative status would be considered, violated the citizen spouse's Fifth Amendment right to due process).

There is also ample authority to support the conclusion that Mr. Arias, an undocumented alien, possesses the same fundamental right. *See Theck v. Warden, I.N.S.*, 22 F. Supp. 2d 1117, 1122 (C.D. Cal. 1998) (holding that an excludable alien had a fundamental constitutional right to marry, reasoning that "[a]s a general matter, persons within the jurisdiction of the United States should be considered to be protected by the Constitution, unless it has been expressly held otherwise"); *Manwani v. U.S. Department of Justice*, 736 F. Supp. 1367, 1382 (W.D.N.C. 1990) (holding that section 5 of the Immigration Marriage Fraud Amendments of 1986, implicated the constitutionally-protected interests of the alien spouse); *Azizi v. Thornburgh*, 908 F.2d 1130, 1133 (2d Cir. 1990) (recognizing alien and citizen spouse's fundamental right to marry, but nevertheless upholding section 5 of the Immigration Marriage Fraud Amendments of 1986, because of Congress' near complete power over matters of immigration); *Smith v. I.N.S.*, 684 F. Supp. 1113, 1116 (D. Mass. 1988) (same); *see also Plyler v. Doe*, 457 U.S. 202, 210, 223 (1982) (declining to treat undocumented aliens as a suspect class because "their presence in this country in violation of federal law is not a "constitutional irrelevancy," but nevertheless holding that "[a]liens, even aliens whose presence in this

country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments"); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("The Fifth Amendment . . . protects every [alien within the jurisdiction of the United States] from deprivation of life, liberty, or property without due process of law. . . . Even one whose presence in this country is unlawful, involuntary, or transitory, is entitled to that constitutional protection"); *In re Alien Children Education Litigation*, 501 F. Supp. 544, 570 (S.D. Tex. 1980) (holding that "the equal protection clause protects undocumented aliens because they are 'persons within the jurisdiction' of the state. State discrimination against illegal aliens is not necessarily permissible, and when a fundamental right is infringed by that discrimination the state must provide a compelling justification").

### 2.     Defendant's Policy is Subject to Strict Scrutiny

In *Zablocki v. Redhail*, the United States Supreme Court dealt with a constitutional challenge to a Wisconsin statute which provided that any resident having minor children not in his custody and which he is under an obligation to support by any court order or judgment may not marry without court approval. 434 U.S. 374, 375 (1978).  The statute further specified that court permission could not be granted unless the marriage applicant proved that he was in compliance with his child support obligation and that the children covered by the support order were not then and were not likely thereafter to become public charges. *Id.*

After reaffirming the fundamental character of the right to marry, *Id.* at 386, the Court stated that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Id.* at 387.  However, the Court concluded that the Wisconsin statute was not such a reasonable regulation, as

it "clearly d[id] interfere directly and substantially with the right to marry." *Id.* at 387. Rather, "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Id.* at 388; *see Plyler*, 457 U.S. at 217 (a classification that affects the exercise of a fundamental right must employ means that are "precisely tailored to serve a compelling governmental interest").

The Court explained that the statute "absolutely prevented" from getting married those applicants who could not obtain the necessary court approval, either because they lacked the financial means to meet their child support obligations or could not prove that their children would not become public charges. *Id.* at 387.  Moreover, the Court noted that "[m]any others, able in theory to satisfy the statute's requirements, will be sufficiently burdened by having to [obtain court approval] that they will in effect be coerced into forgoing their right to marry.  And even those who can be persuaded to meet the statute's requirements suffer a serious intrusion into their freedom of choice in an area in which we have held such freedom to be fundamental." *Id.*

Here, Defendant's policy, of requiring foreign nationals to prove their lawful presence in the United States as a condition precedent for obtaining a marriage license, significantly interferes with Plaintiffs' exercise of their fundamental right to marry.  Indeed, Defendant's policy: (1) absolutely prevents undocumented aliens, such as Mr. Arias, from getting married; and (2) absolutely prevents United States citizens, such as Ms. Buck, from marrying undocumented aliens.  As such, Defendant's policy "place[s] a direct legal

10

obstacle in the path of persons desiring to get married." *See id.* at 387 n.12.  Such a policy is thus subject to strict scrutiny.

### 3. Defendant's Policy Likely Fails Strict Scrutiny

In *Zablocki*, the Court then held that the Wisconsin statute broadly and unnecessarily impinged on the fundamental right to marry, and therefore could not be sustained. *Id.* at 388.  First, the Court did not find a clear connection between Wisconsin's interest in child support collection and the statute's requirements. *Id.* at 389.  "[W]ith respect to individuals who [we]re unable to meet the statutory requirements, the statute merely prevent[ed] the applicant from getting married, without delivering any money at all into the hands of the applicant's prior children." *Id.*  The Court also noted that Wisconsin had "numerous other means for exacting compliance with support obligations, [such as wage assignments, civil contempt proceedings, and criminal penalties,] means that [we]re at least as effective as the instant statute's and yet d[id] not impinge upon the right to marry." *Id.* at 389-90.  Second, the Court found the statute to be both over and under inclusive with respect to its protecting the ability of marriage applicants to meet support obligations to prior children by preventing applicants from incurring new child support obligations. *Id.* at 390.  The statute was underinclusive because it did not limit in any way new financial commitments by the applicant other than those arising out of the contemplated marriage. *Id.*  Indeed, while the statute could prevent the contemplated marriage, it would not prevent the applicant from incurring a support obligation to any children born out of wedlock. *Id.*  The statute was also overinclusive in that a new spouse could actually better the applicant's financial situation by contributing income from a job

or otherwise, thus preventing marriage applicants from improving their ability to satisfy their prior support obligations. *Id.*

Accordingly, the Court concluded that the Wisconsin statute was not closely tailored to effectuate sufficiently important state interests.

Here, Defendant has articulated two state interests she considers sufficiently important to justify the enforcement of her policy.  First, Defendant contends that the only way to identify a foreign national is by requiring a passport with a current visa.  Defendant reasons that the visa requirement is that possession of such a document indicates review and approval by the federal immigration authorities, thereby supporting the authenticity of the foreign passport and therefore the identity of the marriage applicant.  Second, at oral argument and in her brief, Defendant argues that she has a compelling interest in preventing marriage fraud as defined under federal immigration law, 8 U.S.C. § 1325(c) ("Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both").  The Court will address these interests in turn.

### i.     Identification

While the concern over the authenticity of foreign passports may be well-placed, the effect of the requirement of the visa *ipso facto* operates to deny an undocumented alien a marriage license and, to wit, his fundamental right to marry as well as the fundamental right of his citizen fiancé to marry.  Like the statute in *Zablocki*, Defendant's policy lacks a clear connection to the interests advanced by Defendant.  Defendant's policy rests on the rationale that the issuance of a current visa indicates review by federal

12

immigration authorities, thereby supporting the authenticity of the foreign passport and the identity of the applicant.  However, in the Court's opinion, if one has the wherewithal to forge a passport, one can just as easily forge a visa.

Moreover, there are other means by which Defendant must satisfy herself as to the identity of a foreign applicant than the requirement of a visa.  As noted, such a requirement automatically denies the fundamental rights of an undocumented alien and his citizen fiancé to marry.  Defendant can adopt a policy that does not require this denial.  For example, Mr. Williamson testified that the passports which are most often presented to verify the identity of marriage applicants are Irish, Russian, Polish and Mexican. (TRO Hr'g Tr. 16.)  While testimony indicated that Defendant's clerks are unfamiliar with foreign passports, it seems reasonable that they could become familiar with those passports which are most often encountered, so that when there is no visa, Defendant could still become reasonably satisfied as to the passport's authenticity and the applicant's identity.

It is not the Court's function to advise Defendant of the various means by which identity can be established.  It is sufficient to note that the method which denies an undocumented alien a marriage license because he is an undocumented alien cannot be used.

### ii.     Preventing Marriage Fraud

In argument, counsel for Defendant asserted that the challenged policy served the sufficiently important state interest of preventing marriage fraud as defined under 8 U.S.C. § 1325(c).  However, Defendant testified that, in adopting the policy of requiring a passport plus a current visa, she was not attempting to ensure that foreign national marriage applicants were not evading federal immigration laws. (TRO Hr'g Tr. 34-35.)

13

Defendant also testified that the issue of whether Plaintiffs' marriage would be considered fraudulent under federal immigration laws was not her concern. (*Id.*) Therefore, this is not a sufficiently important state interest sought to be furthered by Defendant's policy.

The Court likewise rejects the argument advanced by counsel for Defendant, and testified to by Mr. Cleaver (*see* TRO Hr'g Tr. 72-73), that Defendant's policy was needed in order to avoid being prosecuted by the federal government for aiding and abetting marriage fraud.  Again, Defendant testified that the fear of being prosecuted for aiding and abetting marriage fraud did not concern her. (TRO Hr'g Tr. 35, 54, 58.) Consequently, this does not constitute a sufficiently important state interest.

The final argument advanced by defense counsel was that, since Mr. Arias wants to marry Ms. Buck so as to improve his chances of reentering the United States, he is guilty of marriage fraud.  As such, defense counsel argued that the Court should not countenance Plaintiffs' motion for injunctive relief as a matter of equity.  The Court rejects this contention.  Mr. Arias testified that he was aware that marriage to a United States citizen may well enhance his chances of gaining reentry into the United States sooner than otherwise would be the case.  However, he also maintained that he wished to marry Ms. Buck because she was the woman he loved and with whom he had a child.  This sentiment is, at the very least, a rational explanation for his desire to return to the United States sooner rather than later.  Moreover, the Court is satisfied that it is perfectly consistent with his testimony.  Thus, the Court rejects Defendant's equitable argument.

### 4. Conclusion

Accordingly, because Defendant's policy does not appear to be closely tailored to solely effectuate a sufficiently important state interest, the Court concludes that Plaintiffs have demonstrated a reasonable probability that Defendant's policy violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

### B. Preemption

Plaintiffs next argue that Defendant's policy impermissibly infringes upon an area that is preempted by federal law. However, because the Court has already concluded that Plaintiffs have shown a reasonable probability of success on the merits of their due process and equal protection claims so as to justify the issuance of a preliminary injunction, the issue of preemption need not be addressed at this stage of the litigation.

## III. Irreparable Harm

Plaintiffs will suffer irreparable harm if preliminary relief is not granted. "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). "[I]n order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* (internal quotation marks and citation omitted).

Here, if the Court did not issue a preliminary injunction, Plaintiffs would suffer irreparable harm. They would be deprived of their fundamental constitutional right to marry. "When an alleged deprivation of a constitutional right is involved, most courts hold

that no further showing of irreparable injury is necessary." 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995). The irreparable nature of the injury Plaintiffs would suffer is particularly acute here because of the fact that Mr. Arias is required to report to a United States Embassy or Consulate in Mexico by May 12, 2007. In order to do so, Mr. Arias must begin his long drive by Monday, May 7, 2007, less than one week away. Because Plaintiffs wish to exercise their fundamental constitutional right to marry prior to Mr. Arias' departure, compensation in money after a lengthy trial does not provide an adequate remedy.

Accordingly, the Court finds that Plaintiffs have established that they would likely suffer irreparable harm if a preliminary injunction were not issued.

## IV.   Balance of the Hardships

Granting Plaintiffs' motion for preliminary relief will not cause greater harm to Defendant than the denial of such relief would cause Plaintiffs. To determine which way the balance of the hardships tips, a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it. *See Los Angeles Memorial Coliseum Commission v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980). Here, Defendant argues that, if the Court were to grant Plaintiffs' motion for a preliminary injunction, she "will undoubtedly be . . . onslaught [with marriage] applications by persons similarly situated to Plaintiffs. In addition, the decision may effectively overturn a longstanding policy which has been applied by Registers and Clerks across the Commonwealth." (Def.'s Br. in Opp. 24, Doc. 17.) The Court disagrees. Few, if any, undocumented aliens would risk removal or deportation in order to get married. As such,

Defendant is unlikely to be onslaught with marriage applications by persons similarly situated to Plaintiffs.  In addition, even if Defendant were onslaught with such applications, whatever harm felt by her office surely is not as great as the harm experienced by Plaintiffs in being deprived of their fundamental constitutional right to marry.  As such, the balance of the hardships tilts in favor of Plaintiffs.

**V.     Public Interest**

The violation of a fundamental constitutional right constitutes irreparable injury. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. V. Michigan Liquor Control Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)). Accordingly, the issuance of a preliminary injunction would serve the public interest.

## CONCLUSION

For the reasons stated above, the Court will grant Plaintiffs' motion for a preliminary injunction prohibiting Defendant from requiring Plaintiffs to prove Mr. Arias' lawful presence in the United States as a condition of obtaining a marriage license.

An appropriate Order follows.


 May 1, 2007                                                 /s/ A. Richard Caputo        
Date                                                              A. Richard Caputo
                                                                       United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HEATHER BUCK and JOSE GUADELUPE ARIAS-MARAVILLA, <br><br> Plaintiffs, <br><br> v. <br><br> DOROTHY STANKOVIC, Register of Wills for Luzerne County (in her individual and official capacities), <br><br> Defendant. | CIVIL ACTION NO. 3:07-CV-0717 <br><br> (JUDGE CAPUTO) |

**ORDER**

**NOW**, this ___1st___ day of May, 2007, **IT IS HEREBY ORDERED** that Plaintiffs Heather Buck and Jose Guadelupe Arias-Maravilla's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 3) is **GRANTED**.  Defendant Dorothy Stankovic, Register of Wills for Luzerne County, her agents and employees, are **ENJOINED** and **RESTRAINED** from requiring that Plaintiff Jose Guadelupe Arias-Maravilla produce a visa or other proof of his lawful presence in the United States as a condition of obtaining a marriage license.  This being a non-commercial case involving a relatively small amount of money, and the balance of hardships favors Plaintiffs, the requirement, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, that a security bond be posted is hereby **WAIVED**. *Temple University v. White*, 941 F.2d 201, 220 (3d Cir. 1991).

                                                        /s/ A. Richard Caputo
                                                        A. Richard Caputo
                                                        United States District Judge